## Carpenter *against* Cameron.

The use of the word " executor" is not essential to the appointment of a person to execute a will.   An executor may be appointed expressly or constructively, and designated by committing to his charge those duties which it is the duty of an executor to perform ; by conferring those rights which belong to the office, or by any other language, from which the intention of the testator to invest him with that character may be inferred.

The decree of a register, granting letters testamentary, is conclusive, until reversed on appeal.   The legality of it cannot be inquired into collaterally.

A testator having directed his real estate to be sold, and after the payment of his debts, bequeathed all the residue to his widow, to whom letters testamentary were granted : *held*, that she may maintain ejectment for the land against one who is in possession without right.   Whether in such ejectment she, as plaintiff, be styled executrix or devisee, is a matter of no importance.

A sheriff's sale of the undivided half of a tract of land will confer title upon the purchaser to no more than that quantity ; although at the time of the levy, inquisition and condemnation, the defendant's testator had died seised of two-thirds of the land.   And such one-sixth not levied and sold, may be recovered in ejectment by the devisee, who was, as administrator, the defendant in the execution upon which the land was levied and sold.

ERROR to the district court of *Lancaster* county.

Ejectment by James Cameron and Rebecca his wife, against Dr Abraham Carpenter, to recover the moiety of a tract of land containing two hundred acres.

The facts of the case and the point which arose are minutely detailed in the opinion of the court.

Charge of the court to the jury.

Hays, President.—Both parties derive their titles from Dr Bartram Galbraith, who died in November 1826.. His father, Samuel S. Galbraith, died intestate, seised of this land in fee, leaving issue three children, James and Bartram by one mother, and Juliet his daughter by a second marriage, who was therefore a sister of the half blood.   Each of these children was entitled to one-third part of the plantation in question.

James having died in 1823, intestate and without issue, this third

[Carpenter v. Cameron.]

part thereupon vested in his surviving brother of the whole blood. Bartram Galbraith thus became entitled to the two-third parts of this land, according to the intestate laws. He married Rebecca, now Mrs Cameron, plaintiff in this cause; and in 1826, a short time before his decease, made his last will and testament, by which she was constituted his executrix and devisee (not so named, but in legal effect), and was entitled at his decease to the surplus of his estate, after the payment of his debts.

Dr Abraham Carpenter obtained a judgment against Bartram Galbraith for 2600 dollars penalty, which has been enforced since the decease of the latter, by the sale, under execution, of a part of the premises in dispute    The execution issued upon that judgment was levied upon the one moiety or half part of this plantation.    Upon that moiety, or half part, an inquisition was held.    It was condemned to be sold, and was accordingly sold by the sheriff.    Dr Abraham Carpenter became the purchaser through his agent, and by the sheriff's deed to Mr Buchanan and his deed to the defendant Dr Carpenter, he acquired a right and title in fee to the one half of the premises, and no more.

Bartram Galbraith as we have seen, was seised in fee, after the death of his brother James, of two-third parts of this plantation, equal to the four-sixth parts.    The sheriff levied upon and sold the one half which is equal to the three-sixth parts; consequently one undivided sixth part of Bartram Galbraith's estate in this land, remained unsold, and vested by virtue of his last will and testament in Rebecca Cameron, plaintiff in this suit.    The plaintiffs, James Cameron and Rebecca his wife, are therefore entitled to your verdict for the one undivided sixth part of the land and premises described in the writ.

Plaintiff's points and the court's answers.

1. That at the death of Samuel S. Galbraith in 1810, his plantation, the land described in this suit, descended to his three children, Bartram, James and Juliet; and at the death of James Galbraith in 1823, unmarried and without issue and intestate, his one-third thereof descended to and vested in his brother Bartram; his brother of the whole blood and his heir at law; and therefore Dr Bartram Galbraith died seised of two-thirds of the said plantation, containing two hundred acres, more or less.

*Answer.*    The first proposition is answered in the affirmative.

2. That by the last will and testament of Dr Bartram Galbraith, dated the 3d day of October 1826, given in evidence by the plaintiff in this cause, the said two-thirds of the plantation aforesaid was devised to Rebecca, the wife of the said Dr Bartram Galbraith, and now the wife of James Cameron, and one of the plaintiffs in this cause; and that the said two-thirds of the said plantation, by force and virtue of the said will and devise, passed to and vested in the said Rebecca, one of the above plaintiffs in fee simple.

*Answer.*    By virtue of the will of Dr Bartram Galbraith, his interest and estate in this land passed, at his decease, to his widow Re-

[Carpenter v. Cameron.]

becca, now the wife of James Cameron. It consisted of two undivided third parts of the plantation in dispute.

3. That the levy by the sheriff of Lancaster county, under the executions issued at the suit of Dr Abraham Carpenter, was but on the moiety or half part of the plantation late of Samuel S. Galbraith deceased, and the sale to James Buchanan, in consideration of 505 dollars, by the said sheriff, was but of a moiety or half part of said plantation; and the sheriff's deed to James Buchanan conveys but the moiety or half part of the same land; and the deed from James Buchanan to Dr Abraham Carpenter conveys to the Doctor but the half part of the same land; and as Dr Bartram Galbraith died seised and the owner of two-thirds of the same land, one-sixth of the whole plantation remains, under the will of Dr Bartram Galbraith, vested in the said Rebecca, one of the above plaintiffs.

*Answer.* Answered in the affirmative.

4. That the plaintiffs in the present action, claiming under the will of Dr Bartram Galbraith, claim one-sixth of the plantation described in the pleadings in this suit, and that in law the plaintiffs have made out a good and valid title to the one-sixth part of the said land, and the verdict of the jury should be given for the said one-sixth of the whole plantation.

*Answer.* Answered in the affirmative.

5. That the plaintiffs may recover, in point of law, the said one-sixth part, although in their writ and statement they claimed one-half of the plantation.

*Answer.* Answered in the affirmative.

Defendant's points and the court's answers.

1. That the plaintiffs have shown no title whatever to the premises in dispute, which will enable them to recover in this action; and consequently the verdict of the jury must be in favour of the defendants.

*Answer.* The plaintiffs have, in my opinion, shown a sufficient title to the one-sixth part of the premises to enable them to recover in this action.

2. That as Rebecca Cameron, in whose right this suit is brought, took administration on the estate of her former husband, Bartram Galbraith deceased, on the 8th of December 1826, and then affirmed that he had died intestate; and as in her capacity of administratrix, she and her co-administrator, Dr Thompson, became parties of record to the judgment of Dr Carpenter, and agreed by amicable *scire facias* to revive the same, she, and all others claiming in her right, are estopped from setting up any devise of the premises in dispute to her by her former husband, Bartram Galbraith deceased.

*Answer.* There is nothing in the facts in evidence which are referred to in this proposition that can estop the plaintiffs to set up the devise or gift contained in the last will and testament of Bartram Galbraith.

3. That as the plaintiffs by their writ and statement have de-

[Carpenter v. Cameron.]

manded but an undivided moiety of the tract of land in dispute, and have claimed title only through Bartram Galbraith deceased, they cannot recover in this suit at all; the judgment, execution, levy, condemnation and sheriff's deed, given in evidence by the defendants, being conclusive that this interest of his was divested by a judicial sale, under due process of law.

*Answer.* The plaintiffs claim the unsold residue of Bartram Galbraith's interest in the tract of land in question, which was not divested by the judicial sale referred to. That residue was the one-sixth part of the tract aforesaid, which, having established their title to the same, they may recover in this suit.

4. That as against Bartram Galbraith deceased, the defendant in the judgment and execution of Dr Abraham Carpenter, and all others claiming through him, the levy, condemnation and sheriff's deed given in evidence are effectual to pass his whole estate in the premises sold.

*Answer.* The sheriff's deed and proceedings on which it was founded, are effectual to pass the moiety or half part of the tract of land and premises sold. So much was levied upon, sold and conveyed ; so much and no more passed.

Errors assigned.

" The court erred in their answer to the second point propounded by the plaintiffs' counsel, in charging the jury that by the will of Bartram Galbraith deceased, given in evidence, two-thirds of the plantation in dispute were devised to Rebecca, the widow of the testator, and now one of the plaintiffs, and that the said two-thirds passed to and vested in her by force and virtue of the said will and devise.

" The court erred in their answer to the plaintiffs' third point, in charging the jury that by the execution, levy and sheriff's sale, but one half of the plantation in dispute passed to the sheriff's vendee.

" The court erred in instructing the jury, in answer to the plaintiff's fourth point, that they were entitled to recover one undivided sixth part of the plantation in dispute.

" There is error in the court's answer to the plaintiff's fifth point.

" There is error in the court's answer to the defendant's first point, instructing the jury that the plaintiffs had shown a sufficient title to the one-sixth part of the premises, to enable them to recover.

" The court erred in instructing the jury, in answer to the defendant's second point, that there was nothing in the facts given in evidence referred to in that point, which would estop the plaintiffs to set up the devise or gift contained in the last will and testament of Bartram Galbraith deceased.

" The court erred in their answer to the defendant's third point.

" There is error in the answer of the court to the defendant's fourth point. The jury should have been instructed, that as against Bartram Galbraith deceased, and all claiming under him, the levy, con-

[Carpenter v. Cameron.]

demnation and sheriff's deed, given in evidence, were effectual to pass his whole estate in the premises sold.

" There is error in that part of the general charge in which the jury are instructed, that by the will of Bartram Galbraith deceased, his widow Rebecca, now Mrs Cameron, plaintiff in this suit, was constituted his executrix and devisee; and in that in which it is said that Dr Carpenter, by virtue of the sale under the execution, issued upon his judgment, acquired a right and title in fee to the one half of the premises, and no more : that Bartram Galbraith was seised in fee, after the death of his brother James, of two-thirds, equal to four-sixths of that plantation; that the sheriff levied upon and sold the one half, equal to three-sixth parts, and consequently one undivided sixth remained unsold and vested by virtue of his last will and testament in Rebecca Cameron, plaintiff in this suit; and that the verdict should be accordingly for the one undivided sixth part of the land and premises described in the writ."

*Montgomery* and *Jenkins*, for plaintiff in error, contended, that there was no devise of the land to the plaintiff, and therefore she could not maintain ejectment: it was a money legacy *bequeathed*, and not land *devised.*　Cited, 4 *Watts* 89 ; 5 *Law Lib.* 2 to 15, 48, 57, 92, 137; 11 *Serg. & Rawle* 224; 3 *Watts* 223; 6 *Watts* 32; 4 *Serg. & Rawle* 509.　The plaintiffs cannot sue as executors, because not so named in the will, and their appointment is a nullity.　2 *Bl. Comm.* 503; 9 *Co. Litt.* 40, *a*; *Swin. on Wills* 247; *Williams on Executors* 124; *Gordon's Decedents* 98 ; *Toll. Law of Executors* 97 ; 1 *Lord Raym.* 262 ; 1 *Salk.* 38 ; 2 *Story's Ev.* 240.　The plaintiff, as administratrix, having appeared, and confessed judgment of revival against the whole estate of her husband in favour of the present defendant, is now estopped from claiming the land.　*Co. Litt:* 352, *a*; *Com. Dig.,* tit. *Estoppel, A.* 1 ; 7 *Serg. & Rawle* 467; 11 *Serg. & Rawle* 426 ; 17 *Serg. & Rawle* 364.　The sheriff had no legal power to levy upon less than the entire interest of the defendant in the execution, and the levy and sale made vests the title to the whole of the defendant's interest, whatever it was, in the purchaser.　*Act of* 1801, *sec.* 11, *Purd. Dig.* 294 ; 4 *Yeates* 21 ; 2 *Binn.* 216 ; 8 *Serg. & Rawle* 327 ; 2 *Penns. Rep.* 340 ; 4 *Watts* 270 ; 5 *Serg. & Rawle* 257 ; 1 *Rawle* 155 ; 4 *Rawle* 448 ; 4 *Watts* 195.

*Norris*, for defendant in error.　The appointment of the plaintiff to be the executor was right : it requires not a set form of words to constitute an executor; but if from the tenor of the whole will it appears the testator intended to designate a particular person to execute it, it is sufficient.　*Went. Off. of Executors* 19; *Pow. on Devises* 349 ; *Toll. Law Executors* 32.　On the subject of estoppel, he cited, 3 *Rawle* 326 ; that the land passed to the plaintiff under the will, 4 *Watts* 233, 236.

The opinion of the Court was delivered by

HUSTON, J.—The defendants here were plaintiffs below, and brought this ejectment for one undivided half of a tract of land containing two hundred acres.

At the trial, the plaintiffs claimed one-sixth part of the land; and for so much they had a verdict and judgment.

Both parties assumed that the whole tract was, at one time, the property of Samuel S. Galbraith. By his first wife he had two sons, Bartram and James. James died in 1823, unmarried and without issue. After the death of his first wife, Samuel married Juliet Buchanan, who died, leaving one daughter, Juliet. Samuel married again, but had no issue by his third wife, and died about 1810, leaving Bartram and James, his children by his first wife, and a daughter, Juliet, by his second wife: she is now married to a Dr William Leiper. About 1814, Bartram went to study the practice of physic under Dr Abraham Carpenter. I shall state in the order of time the title of the defendant below, who showed a bond dated 4th February 1820, for 2600 dollars, conditioned for the payment of 1300 dollars on 4th April then next, with interest, and a warrant to confess judgment. This was entered upon the 12th April 1823, as of the preceding January term.

On the 4th of February 1825, this was revived by an amicable *scire facias.*

Dr Bartram Galbraith married a Miss Reigart, who died, leaving no issue. He then married Rebecca Simon, who survived him, and who, together with her present husband, James Cameron, are plaintiffs in this cause. Dr Bartram Galbraith and his wife, with *very many others along the Susquehanna, fell sick in the autumn* of 1826. His wife was removed to Lancaster, to her father's. After her departure, he sent for a justice of the peace, who, by his direction, wrote his will. He was then able to sit up, and to walk through the house.

The will was as follows:

"In the name of God, amen. I, Bartram Galbraith, of the town of Bainbridge, in the county of Lancaster, considering the uncertainty of this mortal life, and being of sound mind and memory (blessed be God for the same), do make and constitute this my last will and testament, in manner and form following, to wit. First, it is my will, and I do order and direct, that after my decease my funeral expenses be defrayed, and all my legal debts be liquidated, and for that purpose I do authorise and direct my survivors to sell and dispose of all my real and personal estate, for the purposes abovementioned; and the surplus, should there any remain, I do give and bequeath unto my dear wife Rebecca. I do also give and bequeath unto my dear wife the watch I carry. Item, I give and bequeath unto my sister Juliet the portrait of my brother James. I publish and declare this, and none other, to be my last will and testament.

[Carpenter v. Cameron.]

In witness whereof I have hereunto set my hand and seal, this 3d day of October, A. D. 1826.     BARTRAM GALBRAITH, [L.S.]

"Signed and sealed in presence of Robert H. Jones."

Soon after this, Dr Galbraith also set out to go to Lancaster, but only reached his brother William's house, at Mountjoy, where he died in a day or two after.

I may here state that it was alleged that his wife, being sick at her father's in Lancaster, did not know or hear of this will until since her second marriage; it was found in a drawer of a desk, among other papers, and immediately proved, and this suit brought.

After the revival of the judgment, in 1825, Dr Carpenter issued one or more writs of *fieri facias*, which, being found erroneous, from some mistake between the district court and common pleas, were not executed.

On the 6th of December 1826, letters of administration were granted to the widow, Rebecca Galbraith, and Dr William Thompson, in the usual form; and a bond, with sureties, in the form prescribed by law, in which was the usual clause, that if a will should be found and proved, they would deliver up the said letters of administration.

The defendants then gave in evidence an agreement by these administrators to enter an amicable *scire facias* on the judgment of Dr Carpenter, against them, as administrators of B. Galbraith, and to give judgment for 1948 dollars 62 cents. This was filed in the prothonotary's office May 15th, 1827, and the *scire facias* and judgment thereon the same day.

A *fieri facias* issued on this judgment, No. 10, of August 1827. The return was, "I have seized and taken in execution the within described property, late the estate of Dr Bartram Galbraith deceased, which remains, &c." The only description of the property was in the inquisition annexed to the writ, which found, "that the rents, issues and profits of the undivided half part of a tract of land containing one hundred and eighty acres, more or less, with a log house, &c. (describing the improvements and local situation), late of the estate of Dr Bartram Galbraith deceased, in the same writ named, were not of a clear yearly value," &c. The defendants further showed a *venditioni exponas,* and a sale by the sheriff of Lancaster county on the 19th of November 1827 to James Buchanan, Esq. for 505 dollars, and a sheriff's deed to Mr Buchanan, and a deed poll indorsed thereon, by which he transferred the property to Dr Carpenter for the same price; both recorded. Dr Carpenter has been in possession since that time. According to the testimony, Dr Carpenter had, as guardian of Juliet while she was a minor, and as agent for the heirs in some suits, been in possession of the whole of this farm from about 1815.

On the 14th of July 1835, the above will of Bartram Galbraith was proved before the register of Lancaster county by Robert H. Jones, the subscribing witness, and by John Smith, who was ac-

quainted with Dr Bartram Galbraith, and often saw him write, and who swore the signature was the handwriting of said Dr Bartram Galbraith; and his sanity was proved at that period by the above persons, and by the person who drew the will; and on the 22d of August 1835, the register granted letters testamentary to the widow and devisee, and her husband, who were plaintiffs in the cause below.

To all this testimony and the probate of the will and letters testamentary, bills of exception were taken. In this court the argument seemed to be against the effect of what had been done, rather than to the evidence of what had been done. In other words, that there was no executor appointed by this will, and that letters of administration with the will, ought to have been granted. Our acts of assembly have not designated what shall amount, in a will, to making any person executor of that will; their provisions are precise, in most cases, where a person or persons are designated executors, and renounce or remove out of the state, or die. What shall amount to appointing or designating an executor is left as it was; all authorities agree that the word executor is not necessary. That an executor may be appointed expressly or constructively by committing to his charge those duties which it is the province of an executor to perform, or by conferring those rights which belong to the office, or by any other means by which the intention of the testator to invest him with that character, may be inferred: as if a testator direct that A shall have his property, after paying his debts; so, when after giving various legacies he directed that his debts and legacies being paid, his wife should have the residue, if she gave security for the performance of the will, *Toller* 35. (These last words savour more of an administration than of an executorship, and she must have been more clearly entitled to be executor if they had not been added.) So far as the cases cited, or our researches have gone, the above, from *Toller*, is a fair synopsis of the law, as found from *Swinburne* to *Williams on Executors*; the one among the earliest, and the other among the latest writers on the subject. There may be cases in which it may be not very clear what was the intention of the testator, and perhaps this may be one of those cases. It might have been decided that letters of administration, with the will annexed, were proper. The officer granted letters testamentary. This court has not decided which would have been most proper, nor have we discussed that question; because by section fifth of the act of 15th March 1832, *Stroud's Purdon* 857, every register qualified to act as aforesaid, shall have jurisdiction within the county for which he shall have been appointed, of the probate of wills and testaments, of the granting letters testamentary and of administration, of passing and filing the accounts of executors, administrators, guardians, &c.; and by section seventeen of the same law, it is directed that all original wills, &c., &c. shall be recorded, &c., and the copies of such wills and probates under the seals of the courts or offices where the same may

[Carpenter v. Cameron.]

have been, or shall be so taken or granted respectively (except copies or probates of such wills as shall appear to have been annulled, disproved or revoked), shall be adjudged, and are hereby enacted to be matter of record, and good evidence to prove the gift or devise thereby made.

Section thirty-one says; from all official acts of the register appeals may be taken to the register's court, at any time within three years: and sections thirty-nine to forty-two, inclusive, direct proceedings there, and from the register's court give an appeal to the supreme court.

Independently of the general rule that the decisions of a court of exclusive jurisdiction are conclusive, until reversed, on all matters within such jurisdiction, it would seem that these express provisions of our act of assembly compel the admission of this will and probate, and letters testamentary in every court of the state. They are enacted to be matter of record, and good evidence to prove the gift or devise thereby made.

It was said if this probate was not within the jurisdiction of the register, it was utterly void, and should have been rejected; but this was not, and could not be seriously pressed. There is no allegation that the will was not duly proved, and before the register, and he alone had jurisdiction to grant letters testamentary, or of administration with the will annexed: if he mistook, an appeal was the remedy. But it is said, if this last had been the case, security must have been given, and thus the creditors would be free from danger of loss. If there was really any one seriously afraid in this particular, and will make oath of it, he can soon have the security spoken of.

Another point somewhat urged by the counsel of the defendant below was, that Dr Carpenter, by his levy and sale of "the undivided half part of a tract of land," &c., could hold the whole interest of the defendant, if it should turn out to be two-thirds, or three-fourths, or the whole of the tract; and not a few cases were cited, or rather the dicta in those cases; but in not one of them was the point now in consideration in the view of the court.

It was a matter about which lawyers and laymen talked for years, whether a sale on execution by a sheriff passed the land to a purchaser clear of prior liens; and what was said at the sale by the sheriff, and sometimes what was said by the bystanders, was offered in evidence to show what the rights of the purchaser were; and the court said those rights depended on the law, and not on the sheriff, or cryer, or bystanders, unless in very particular cases.

Sometimes the quantity was not accurately stated in the levy, and the question was, what would pass under the words "more or less," or under those words accompanied by the designation that it was a tract of land in the occupation of the defendant, and as defendant had notice of the levy, inquisition and sale, if he did not apply to have the quantity corrected, if it was too small, did the purchaser take the whole farm, though containing more acres than the deed? In

[Carpenter v. Cameron.]

Streeper and Fisher the levy was on a ground rent, issuing out of a lot particularly designated; the sheriff's deed, by a mistake of the scrivener, conveyed the lot instead of the ground rent. The decision was that it depended on the levy, not on the deed; and in delivering the opinion, the judge uttered some dicta, that the interest levied on, or any less interest which defendant had, would pass to the purchaser under a levy and sale; but expressly said, "I do not say that a greater interest than that levied on, would not pass."

The act of 21st March 1806 provides, that not less than a whole farm or tract, if all owned and occupied by one person, shall be levied on; and the spirit of this act would direct that if a man owned the whole, or certain aliquot parts, the plaintiff would be bound to levy on the whole interest. Certainly, if either the plaintiff or the defendant, at any time before the acknowledgement of the sheriff's deed, should make known that this law had been violated, by levying on part of a tract, or, where the defendants had an undivided interest, by levying on less than that interest, the executions would be all set aside, or, perhaps, in some cases, the terms of the levy corrected and a new sale ordered. These proceedings would be decided on according to circumstances and consent of parties. But after a sale and deed acknowledged, as in this case, and long acquiescence, I am not aware that it has been, or can be decided, that a levy and sale contrary to the directions of this act woud be void, unless procured by fraud or misrepresentation of the plaintiff, or purchaser, or both. If, however, this act can have any effect in such a case, it cannot be in favour of a plaintiff purchaser. The act was made to protect defendants in executions, and prevent their lands from being taken from them in small parcels, when the rents and profits of the whole would have paid the debts in seven years. . It is not intended to give even the individual opinion of the judge, as to the effect of this law on the title of the purchaser at sheriff's sale, further than that, in this case, the levy and sale does not vest in Dr Carpenter *more* than one undivided half part of the tract.

Another objection was, that where land is devised to be sold to pay debts, or divided among several, or the price to be paid to one, it is considered, to all intents, as money; and many British, and some of our own authorities, were cited. Without entering into all the questions which occur under this rule, in different circumstances, we are of opinion it has no application in the case before us.

A creditor of a decedent, who gets possession of property belonging to the estate in any other way than by purchase from the executor, or purchase under process of law, is as much a trespasser as any stranger. A person, then, having no right, gets into possession; the executor has by common law, and by our act of 1800, express authority to bring ejectment to obtain possession, in order that he may sell, and apply the money according to the directions in the will; or he may convey at private sale, and the purchaser may support ejectment; if there is any objection to such private sale, it is for

[Carpenter v. Cameron.]

those interested to investigate and contest it; not for a trespasser, who has got into possession without right.

Not a little was said as to whether the plaintiff below was claiming as executrix or devisee. They styled themselves neither executors or devisees, and it was not necessary that they should. In a case where a person, who has no other right than an executor, is plaintiff in ejectment, and dies before the cause is ended, there may be a convenience in his being styled executor. By our present law his executor will not be executor of the first testator; and as the person next in interest is to be substituted as plaintiff, there may be difficulty in deciding who is next in interest, where the deceased plaintiff had stated that he sued out the writ in the character of executor. The record, in case of recovery, will also show for whose benefit the recovery was; but it has never been held necessary that the style of executor should be added; nor has it, to my knowledge, been contended in this state that it was necessary to state that the plaintiff brought ejectment as executor, except in one case, before Judge Shippen, at a circuit court in Lycoming, in which R. Tunis was plaintiff, and claimed as executor of Roberts, but was not so styled on the record. The judge at once said, if plaintiff showed a right in himself, it was never necessary to state in the writ, or title of the writ, the nature of that right. I think in the middle counties it has never been discussed since, and seldom has the plaintiff been stated to sue as executor. In one case I knew of a long contest between the heirs of the executor and of the first testator, who should be substituted under the act of 1807, upon the death of the plaintiff; and for this cause I would advise counsel who bring ejectments for executors, to state it so on the record.

It is no part of this cause to state or decide what effect any statute of limitation or lapse of time, since the death of Dr B. Galbraith, may have on the claims of his creditors; if that is disputable, it will be decided when it occurs. The judge very properly avoided deciding the question raised by the defendant below, as to executor and devisee, and as to the effect on the rights of creditors, whether in one or the other character. It was enough to settle in this cause that one-sixth of this farm, which was vested in Dr Galbraith at his death, remained undisposed of, and that under his will, the plaintiffs had a right to recover possession of that undivided sixth.

It has been conceded, on both sides, that either Dr Carpenter did not know that Juliet was only a sister of the half blood to James and Bartram, or that he did not know that the law in this case gave all to the full brother; and that the widow of Bartram was under the same misapprehension. There is not any thing to which the docrine of estoppel can apply. Dr Carpenter had been in possession of this property, as guardian and agent of the family, ten years; it is not surmised that the widow gave in the levy, or was consulted about it. The one-sixth, now in dispute, is not embraced in that levy or sale; the present plaintiff did nothing, in the whole matter of sale, except

not to object.   I can see nothing like estoppel of record, or *in pais*, as to them.   If indeed it were proved that the widow gave in the levy, it might be otherwise.   As little effect has the fact that she administered before she knew of the will, or her own rights.   Our act of assembly contemplates such a case, and makes provision that the acts of the administrator shall be good until the will is discovered; and his authority ceases when the will is proved.

Judgment affirmed.